# Exhibit A

FILED: NEW YORK COUNTY CLERK 06/05/2013

NYSCEF DOC. NO. 1

INDEX NO. 651991/2013

RECEIVED NYSCEF: 06/05/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NGA TRAN-PEDRETTI,                                          Index No.

                    Plaintiff,

          -against-                                         **SUMMONS**

CIFC ASSET MANAGEMENT LLC, CIFC
CORP., CIFC ACQUISITION CORP., CIFC
PARENT HOLDINGS LLC, PETER
GLEYSTEEN, STEVE VACCARO, OLIVER
WRIEDT, FREDERICK ARNOLD, SAMUEL P.
BARTLETT, MICHAEL R. EISENSON, JASON
EPSTEIN, ANDREW INTRATER, PAUL F.
LIPARI, ROBERT B. MACHINIST, TIM R.
PALMER, and FRANK C. PULEO,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO DEFENDANTS:

     YOU ARE SUMMONED to appear in this action by serving your answer to the
complaint on the plaintiff's attorney within the time limits stated below.

     New York County is designated as the county where this action will be tried, because all
of the Defendants reside and/or conduct business within New York County.

TIME LIMIT TO ANSWER:

     Because this summons is served by delivery to you personally within New York State,
you must answer the complaint within TWENTY (20) days after such delivery.

**IF YOU FAIL TO ANSWER THE COMPLAINT** within the time stated, judgment will be
entered against you for the relief demanded in the complaint.

Dated: New York, New York
       June 5, 2013

                              Reed Smith LLP

                              By: _____

                              Casey D. Laffey
                              599 Lexington Avenue
                              New York, New York 10022
                              (212) 521-5400
                              *Attorneys for Plaintiff Nga Tran-Pedretti*

US_ACTIVE-112459224.16-CATHOMAS 06/05/2013 2:43 PM

Defendants' Addresses:

CIFC ASSET MANAGEMENT LLC
250 Park Avenue, 4th Floor
New York, New York 10177

CIFC Corp.
250 Park Avenue, 4th Floor
New York, New York 10177

CIFC Acquisition Corp.
250 Park Avenue, 4th Floor
New York, New York 10177

CIFC Parent Holdings LLC
250 Park Avenue, 4th Floor
New York, New York 10177

Peter Gleysteen
250 Park Avenue, 4th Floor
New York, New York 10177

Steve Vaccaro
250 Park Avenue, 4th Floor
New York, New York 10177

Oliver Wriedt
250 Park Avenue, 4th Floor
New York, New York 10177

Frederick Arnold
250 Park Avenue, 4th Floor
New York, New York 10177

Samuel P. Bartlett
200 Clarendon Street, 54th Floor
Boston, Massachusetts 02116

Michael R. Eisenson
200 Clarendon Street, 54th Floor
Boston, Massachusetts 02116

Jason Epstein
900 Third Avenue, 19th Floor
New York, New York 10022

Andrew Intrater
900 Third Avenue, 19th Floor
New York, New York 10022

Paul F. Lipari
900 Third Avenue, 19th Floor
New York, New York 10022

Robert B. Machinist
900 Third Avenue, 19th Floor
New York, New York 10022

Tim R. Palmer
200 Clarendon Street, 54th Floor
Boston, Massachusetts 02116

Frank C. Puleo
250 Park Avenue, 4th Floor
New York, New York 10177

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NGA TRAN-PEDRETTI,                                              Index No.

                     Plaintiff,

           -against-                              **COMPLAINT**

CIFC ASSET MANAGEMENT LLC, CIFC            **JURY TRIAL DEMANDED**
CORP., CIFC ACQUISITION CORP., CIFC
PARENT HOLDINGS LLC, PETER
GLEYSTEEN, STEVE VACCARO, OLIVER
WRIEDT, FREDERICK ARNOLD, SAMUEL P.
BARTLETT, MICHAEL R. EISENSON, JASON
EPSTEIN, ANDREW INTRATER, PAUL F.
LIPARI, ROBERT B. MACHINIST, TIM R.
PALMER and FRANK C. PULEO,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff Nga Tran-Pedretti ("Plaintiff"), by and through her attorneys, Reed Smith LLP,

complaining of the Defendants, alleges as follows:

## INTRODUCTION

    1.    Plaintiff complains pursuant to the laws of the State of New York and the

Administrative Code of the City of New York, seeking damages to redress the injuries she has

suffered as a result of being harassed, discriminated against, retaliated against and discharged on

the basis of her race, ethnicity, national origin, sex, gender and age and for reporting the

unlawful conduct to which she was subjected.

    2.    Plaintiff additionally complains pursuant to the laws of the State of New York

seeking damages to redress the injuries she has suffered as a result of acts or omissions resulting

in fraud and breach of fiduciary duties in connection with the purchase or sale of securities.

3.     Plaintiff also complains pursuant to the laws of the State of Delaware seeking damages to redress the injuries she has suffered as a result of acts or omissions resulting in fraud or deceit in connection with the purchase or sale of securities.

4.     Plaintiff further complains pursuant to Rule 10b-5 (as promulgated by the Securities and Exchange Commission pursuant to Section 10(b) of the Securities Exchange Act of 1934) seeking damages to redress the injuries she has suffered as a result of acts or omissions resulting in fraud or deceit in connection with the purchase or sale of securities.

5.     Plaintiff finally complains pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, codified at 78 U.S.C. § 78u-6, *et seq.* ("Dodd-Frank Act")

## PARTIES

6.     That at all times hereinafter mentioned, Plaintiff was and still is a resident of the County of Westchester, Town of Pound Ridge and State of New York.

7.     That at all times hereinafter mentioned, the Defendant CIFC ASSET MANAGEMENT LLC ("Defendant CIFCAM") was and is a Delaware Limited Liability Company duly authorized to conduct business in the State of New York.

8.     That at all times hereinafter mentioned, the Defendant CIFCAM, was and is an entity organized to conduct business in the State of New York.

9.     That at all times hereinafter mentioned, Defendant CIFCAM has operated its business at 250 Park Avenue, New York, New York 10177.

10.     That at all times hereinafter mentioned, Defendant CIFC CORP. ("Defendant CIFCC" or "Company") was and is a Delaware corporation duly authorized to conduct business in the State of New York.

11.     That at all times hereinafter mentioned, Defendant CIFCC, was and is an entity organized to conduct business in the State of New York.

12.     That at all times hereinafter mentioned, Defendant CIFCC operated its business at 250 Park Avenue, New York, New York 10177.

13.     That at all times hereinafter mentioned, Defendant CIFC ACQUISITION CORP. ("Defendant CIFCAC") was and is a Delaware corporation duly authorized to conduct business in the State of New York.

14.     That at all times hereinafter mentioned, Defendant CIFCAC, was and is an entity organized to conduct business in the State of New York.

15.     That at all times hereinafter mentioned, Defendant CIFCAC operated its business at 250 Park Avenue, New York, New York 10177.

16.     That at all times hereinafter mentioned, Defendant CIFC PARENT HOLDINGS LLC ("Defendant CIFCPH") was and is a Delaware Limited Liability Company duly authorized to conduct business in the State of New York.

17.     That at all times hereinafter mentioned, Defendant CIFCPH was and is an entity organized to conduct business in the State of New York.

18.     That at all times hereinafter mentioned, Defendant CIFCPH operated its business at 250 Park Avenue, New York, New York 10177.

19.     Hereinafter, Defendant CIFCAM, Defendant CIFCC, Defendant CIFCAC and Defendant CIFCPH shall be referred to collectively as the "CIFC Defendants."

20.     That at all times herein relevant, Defendant PETER GLEYSTEEN ("Defendant GLEYSTEEN") was and is a resident of the State of New York.

21.     That at all times herein relevant, Defendant GLEYSTEEN was and is the Chief Executive Officer ("CEO") of Defendant CIFCC.

22.     That at all times herein relevant, Defendant GLEYSTEEN was also a member of the Board of Directors of Defendant CIFCC.

23.     That at all times herein relevant, Defendant GLEYSTEEN acted in the course of his employment with the Defendant CIFCC.

24.     That at all times herein relevant, Defendant STEVE VACCARO ("Defendant VACCARO") was and is a resident of the State of New York.

25.     That Defendant VACCARO was the Co-Chief Investment Officer of Defendant CIFCC through 2011 and is now its Chief Investment Officer ("CIO").

26.     That at all times herein relevant, Defendant VACCARO acted in the course and scope of his employment with Defendant CIFCC.

27.     That at all times herein relevant, Defendant OLIVER WRIEDT ("Defendant WRIEDT") was and is a resident of the State of New York.

28.     That at all times herein relevant, Defendant WRIEDT was and is the Head of Capital Markets & Distribution of Defendant CIFCC.

29.     That at all times herein relevant, Defendant WRIEDT acted in the course and scope of his employment with Defendant CIFCC.

30.     That at all times herein relevant, Defendant FREDERICK ARNOLD ("Defendant ARNOLD") was and is a resident of the State of New York.

31.     In 2011 and thereafter, Defendant ARNOLD was and is a member of the Board of Directors of Defendant CIFCC.

32.     That at all times herein relevant, Defendant SAMUEL P. BARTLETT ("Defendant BARTLETT") was and is a resident of the State of Massachusetts.

33.     That at all times herein relevant, Defendant BARTLETT was and is a member of the Board of Directors of Defendant CIFCC.

34.     That at all times herein relevant, Defendant MICHAEL R. EISENSON ("Defendant EISENSON") was and is a resident of the State of Massachusetts.

35.     That at all times herein relevant, Defendant EISENSON was and is a member of the Board of Directors of Defendant CIFCC.

36.     That at all times herein relevant, Defendant JASON EPSTEIN ("Defendant EPSTEIN") was and is a resident of the State of New York.

37.     In 2011 and thereafter, Defendant EPSTEIN was and is a member of the Board of Directors of Defendant CIFCC.

38.     That at all times herein relevant, Defendant ANDREW INTRATER ("Defendant INTRATER") was and is a resident of the State of New York.

39.     In 2011 and thereafter, Defendant INTRATER was and is a member of the Board of Directors of Defendant CIFCC.

40.     That at all times herein relevant, Defendant PAUL F. LIPARI ("Defendant LIPARI") was and is a resident of the State of New York.

41.     In 2011 and thereafter, Defendant LIPARI was and is a member of the Board of Directors of Defendant CIFCC.

42.     That at all times herein relevant, Defendant ROBERT B. MACHINIST ("Defendant MACHINIST") was and is a resident of the State of New York.

43.     In 2011 and thereafter, Defendant MACHINIST was and is a member of the Board of Directors of Defendant CIFCC.

44.     That at all times herein relevant, Defendant TIM R. PALMER ("Defendant PALMER") was and is a resident of the State of Massachusetts.

45.     That at all times herein relevant, Defendant PALMER was and is a member of the Board of Directors of Defendant CIFCC.

46.     That at all times herein relevant, Defendant FRANK C. PULEO ("Defendant PULEO") was and is a resident of the State of New York.

47.     That at all times herein relevant, Defendant PULEO was and is a member of the Board of Directors of Defendant CIFCC.

48.     Hereinafter, Defendants GLEYSTEEN, VACCARO, WRIEDT, ARNOLD, BARTLETT, EISENSON, EPSTEIN, INTRATER, LIPARI, MACHINIST, PALMER and PULEO are collectively referred to as the "Individual Defendants."

49.     The CIFC Defendants and the Individual Defendants are collectively referred to herein as the "Defendants."

## JURISDICTION AND VENUE

50.     This Court has personal jurisdiction over the CIFC Defendants pursuant to CPLR 301 because the CIFC Defendants are authorized to conduct business in New York.

51.     This Court has personal jurisdiction over the Individual Defendants pursuant to CPLR 301 because the Individual Defendants reside and/or conduct business in New York.

52.     In addition, pursuant to CPLR 302, this Court has personal jurisdiction over the Defendants because this lawsuit arises out of Defendants' transaction of business and tortious conduct that occurred in New York.

53.     Pursuant to CPLR 503, venue is appropriate in New York County because the Defendants reside and/or conduct business within New York County.

## FACTS COMMON TO ALL CAUSES OF ACTION

54.     Plaintiff is a Vietnamese female, born in Can Tho, Vietnam.

55.     Plaintiff has over eighteen years of experience in corporate finance, leveraged finance, and financial sponsor coverage and asset management.

56.     Prior to working for Defendant CIFCC, Plaintiff spent nearly ten years in the financial sponsor group of J.P. Morgan and its predecessor firms, where she managed relationships with some of the bank's largest private equity firms, including The Blackstone Group, and originated senior and subordinated debt, merger and acquisition advisories, and equity offerings.

57.     Plaintiff was one of the highest performing bankers at J.P. Morgan and was personally recruited to the bank by one of its Vice-Chairmen.

58.     Plaintiff earned a Bachelor of Science in Economics from the School of Foreign Service, Georgetown University and a Master's of Business Administration from the Darden School of Business at the University of Virginia.

59.     Plaintiff commenced employment with Defendant CIFCC in or about November 2005.

60.     Plaintiff was the very first employee hired by Defendant CIFCC after Defendant GLEYSTEEN.

61.     Plaintiff was continuously employed by Defendant CIFCC from November 2005 through December 2012.

62.     As part of Plaintiff's work, she was integrally involved in the infrastructure development, recruiting, staffing, fundraising, investor development, acquisition, merger and integration of new businesses onto Defendant CIFCC's platform.

63.     Throughout her time at Defendant CIFCC, numerous press releases referred investors to Plaintiff in the context of, among other things, earnings releases and merger and acquisition announcements.

64.     Plaintiff readily accepted multiple responsibilities from Defendant CIFCC's inception in order to help the firm grow organically and by acquisitions.

65.     In 2008, Plaintiff shifted from focusing on asset sourcing to focus on investors and other institutional relationships significant to Defendant CIFCC's asset management platform.

66.     In 2008, Plaintiff's title was changed by Defendant CIFCC to Head of Institutional Relations.

67.     Each and every formal employment review that Plaintiff received during her employment with Defendant CIFCC indicated that Plaintiff's work performance was excellent.

68.     In Plaintiff's 2009 Year End Performance Evaluation, Defendant GLEYSTEEN stated that Plaintiff was "highly focused," an "exemplary representative of the firm to all constituencies" and a "very professional and excellent role model to senior and junior colleagues, including work ethic, hewing to excellence as the firm's base standard. . . ." Defendant GLEYSTEEN also added a handwritten note on the review form stating, "you are great to work with, Nga, and have huge potential."

69.     In or about October or November of 2011, Plaintiff was placed in charge of marketing new Defendant CIFCAM funds to clients of Sandler O'Neill, Credit Suisse, and Avebury Capital.

70.     As late as February 2012, Defendant EISENSON told Plaintiff that he was willing to introduce her and CIFC to market new funds to investors and gatekeepers to institutional investors.

71.     At no time during Plaintiff's employment with Defendant CIFCC did she receive a performance review that was less than excellent.

72.     Plaintiff was earning approximately $750,000.00 per year, including base salary and bonuses, at the time of her employment termination.

73.     Given her central role in the Company, Plaintiff was named as a "Key Man" in at least six of the original seven funds of Commercial Industrial Finance Corp. ("CIFC") totaling an excess of $3 billion at the 2007 year-end.

74.     At its inception in 2005, Plaintiff invested significant capital in the original CIFC platform. After a reorganization in late 2009/early 2010 these investments were effectively organized into investments in Defendant CIFCPH.

75.     Plaintiff continued to invest in Defendant CIFCPH and Defendant CIFCC in subsequent years, including investment in preferred stock, a deferred compensation program and stock options.

76.     During her tenure, Plaintiff was always one of the top four or five most highly compensated employees in the Company.

77.     During Plaintiff's employment with the Company, Defendants subjected Plaintiff to numerous acts of hostile work environment harassment, discrimination and other unlawful employment practices, including but not limited to the following:

     a.  Despite Plaintiff's productive contribution and strong reviews on marketing to
         investors in new funds (such as her successful closing of the Williams College
         Investment Office's seed investment in a new fund of Defendant CIFCC),
         onboarding newly acquired funds in mergers or acquisitions for Defendant
         CIFCC, and among other initiatives for which she was primarily responsible,
         Defendant GLEYSTEEN repeatedly told Plaintiff and several others that he was

the best marketer for the CIFC Defendants, implying that Plaintiff could not be such a marketer due to her national origin, ethnicity, gender and age.

b.  Between 2005 and 2011, on multiple occasions, Defendant GLEYSTEEN refused to permit Plaintiff to assist with the direct marketing of Defendant CIFCC's new funds to investors and consultants in Europe, Japan and throughout the United States, despite her extensive background in such matters.

c.  Defendant GLEYSTEEN told Plaintiff that she could not market to certain investors because of her gender and national origin.

d.  Defendant GLEYSTEEN humiliated Plaintiff by requiring her to ask a male Japanese financial advisor to Defendant CIFCC in writing if she, as a female of Vietnamese origin, was acceptable to market to Japanese institutional investors.

e.  Between 2005 and 2011, on multiple occasions, Defendant GLEYSTEEN told investors or bankers, in Plaintiff's presence, that Plaintiff looked "as if she just graduated" from school.

f.  Upon information and belief, Defendant GLEYSTEEN took the actions and made the remarks set forth in the preceding paragraphs in a deliberate attempt to undermine Plaintiff's credibility because he did not want a person of her gender, race, ethnicity, age and national origin to succeed at the Company.

g.  On multiple occasions between 2005 and 2011, Defendant GLEYSTEEN belittled and humiliated current and former female employees of the Company.

h.  In March 2012, Defendant WRIEDT was hired to lead Defendant CIFCC's Capital Markets & Distribution function.

i.   Upon information and belief, Defendant GLEYSTEEN and Defendant CIFCC and its Board deliberately decided to place Defendant WRIEDT in a position of direct supervisory authority over Plaintiff rather than in a position of supervisory authority over any of the male employees on Plaintiff's level each of whom was of American descent.

j.   Defendant GLEYSTEEN could not provide an explanation why Plaintiff needed a supervisor when she had never been criticized for any shortcomings or poor performance between 2005 and 2011.

k.   On multiple occasions, Defendant WRIEDT asked Plaintiff to go to late dinners with him.

l.   Plaintiff refused Defendant WRIEDT's requests for dinner but offered to meet for breakfast, lunch or any other time during normal business hours.

m.   By repeatedly requesting that Plaintiff meet with him for meetings after normal business hours, late night dinners and drinks despite Plaintiff's clear and consistent objections to meeting at such a time and manner, Defendant WRIEDT made Plaintiff feel that she could not succeed at that Company without compromising her morality and consenting to late night dinners and drinks with him.

n.   Upon information and belief, Defendant WRIEDT's conduct described in the preceding paragraph was intended to force Plaintiff to voluntarily terminate her own employment because he did not believe that a highly moral woman was capable of successfully marketing for the Company.

o.  Plaintiff explained to Defendant WRIEDT that as a working mother she would prefer and be available for breakfast and lunch meetings.

p.  Plaintiff also explained that she would meet or speak with investors, including overseas investors, at any time, including for dinners or late night conference calls.

q.  Despite Plaintiff's previous refusals, Defendant WRIEDT continued to invite Plaintiff to attend late night meetings and/or dinners with him without any potential investors present.

r.  Other senior members of Defendant CIFCC told Plaintiff if she preferred not to partake in late night activities on marketing trips overseas, "not to worry…we will take you back to the hotel and tuck you into bed early."

s.  Upon information and belief, in November or December 2012, Defendants VACCARO and WRIEDT co-hosted a dinner for senior investment professionals, which concluded at approximately 11:30 PM, after which all the men headed to a late-night bar for additional rounds of drinking alcoholic beverages.

t.  Upon information and belief, on or about December 10, 2012 during the Company's annual holiday party at Maloney & Porcelli ("Holiday Party"), Defendant WRIEDT became so disruptive, by, among other things, barring anyone from entering the men's room for approximately forty-five minutes, and the restaurant refused to serve the CIFCC group more alcohol.

u.  On numerous occasions, during meetings attended by all men, with the exception
    of the Plaintiff, Defendant GLEYSTEEN singled out Plaintiff and demanded her
    to get coffee or order lunch for all the meeting members.

v.  In 2011, when a contract to market new loan funds was being finalized with
    Credit Suisse Group and Avebury Capital, Plaintiff told Defendant CIFCC's
    General Counsel that Defendant GLEYSTEEN required her to ask a male
    Japanese financial advisor of Defendant CIFCC in writing if she, as a female of
    Vietnamese origin, was acceptable to market to Japanese institutional investors.

w.  The General Counsel's response was that he "didn't want to hear about it" and put
    up his hands against his ears.

x.  In June 2012, despite successfully performing high-level management work at
    Defendant CIFCC since its inception, Plaintiff was not asked to join the
    Company's newly formed Management Committee.

y.  The Company's newly formed Management Committee was comprised of four
    white males.

z.  In or about July 2012, Defendant CIFCC hired Tom Beaton of Next Step LLC
    (the "Consultant") as a consultant to evaluate the Company's work environment.

aa. On July 27, 2012, the Consultant interviewed Plaintiff and asked her detailed
    questions about the work environment at Defendant CIFCC.

bb. Upon information and belief, the Consultant reported his findings to the
    Company's full Board.

cc. On August 14, 2012, Defendants BARTLETT and EPSTEIN summarized the Consultant's findings to Plaintiff regarding the hostile and difficult work environment at Defendant CIFCC.

dd. After the Consultant's interview with Plaintiff, she asked Defendant CIFCC's General Counsel how to avoid being targeted by Defendant GLEYSTEEN.

ee. Plaintiff stated that she felt harassed and did not want to be left alone in her office with Defendant GLEYSTEEN.

ff. Defendant CIFCC's General Counsel advised Plaintiff to avoid Defendant GLEYSTEEN.

gg. Upon information and belief, the General Counsel did not advise Defendant GLEYSTEEN to avoid engaging with Plaintiff.

hh. Subsequently, Defendant GLEYSTEEN intimidated Plaintiff by entering her office, closing the door, and telling her that "more than one person will pay" for the conclusions set forth in the Consultant's report.

ii. Upon information and belief, the Consultant reported his findings to the full Board of Defendant CIFCC.

jj. Of all Defendant CIFCC's senior managers interviewed by the Consultant, Plaintiff was the only person excluded from weekly meetings to discuss the Consultant's findings.

kk. Upon information and belief, in response to the Consultant's report, in or around August 2012, the Board stripped Defendant GLEYSTEEN of many of his CEO responsibilities and left him as the CEO in name only.

ll. On or about September 21, 2012, Defendant VACCARO told Plaintiff that although she was "well regarded" by everyone senior and junior to her, Defendant WRIEDT no longer wanted Plaintiff on the marketing team.

mm.   On or about September 24, 2012, Defendant WRIEDT informed Plaintiff that she would no longer be part of Defendant CIFCC's marketing team and implied that her gender, race, ethnicity, age and national origin would prevent her from being successful in marketing to institutional investors.

   i. Defendant WRIEDT admitted he never witnessed Plaintiff market to investors.

   ii. At no time did Defendant WRIEDT ever conduct a review of Plaintiff's marketing capabilities.

   iii. Defendant WRIEDT admitted he had less experience than the Plaintiff in the loan asset class of Defendant CIFC.

   iv. Defendant WRIEDT further admitted he was out of touch with the investors that Defendant CIFCC targeted for the marketing of new funds.

nn. On or about September 24, 2012, Plaintiff was asked to relinquish her marketing responsibilities, to cease contact with any clients or prospects unless directed by Defendant WRIEDT, to assume fewer responsibilities, and to assume less compensation going forward.

oo. At a lunch with Defendant GLEYSTEEN, on or about September 28, 2012 in Café Centro of the MetLife Building at Grand Central Station, Plaintiff told Defendant GLEYSTEEN she felt unfairly discriminated against, harassed and retaliated against for her complaints to the Consultant.

pp. Defendant GLEYSTEEN became very defensive and retorted to Plaintiff "what's your basis" with extreme hostility.

qq. As a direct result of the stressful events, discrimination, harassment and other inexcusable and unlawful conduct complained of herein, Plaintiff developed a medical condition for which she sought and received treatment at the New York Presbyterian Medical Center.

rr. On multiple occasions, Plaintiff told her co-workers, including Defendant VACCARO, that the events complained of herein were negatively affecting her health.

78.    Upon information and belief, the conduct described above created a culture that denied senior women the opportunity to succeed at the Company.

79.    Defendants GLEYSTEEN, WRIEDT and VACCARO engaged in a pattern of conduct throughout Plaintiff's employment with the Company that deliberately made Plaintiff feel inadequate based upon her race, ethnicity, national origin, age and gender.

80.    In a follow up discussion in early December 2012, the Consultant told the Plaintiff that he found the working environment was extremely hostile and that she should seek the advice of counsel on her course of action.

81.    Upon information and belief, Defendant CIFCC's Board did not take any prompt, remedial action to address the issues relating to the hostility of the working environment as it relates to Plaintiff.

82.    Upon information and belief, Defendants WRIEDT, VACCARO, GLEYSTEEN and the executive committee of Defendant CIFCC acted, with the full support of Defendant CIFCC's Board, to terminate Plaintiff in December 2012.

83.    Upon information and belief, Defendants unlawfully harassed, discriminated against and retaliated against Plaintiff.

84.    Upon information and belief, Defendants created an unlawful hostile work environment for Plaintiff.

85.    Upon information and belief, Defendants treated Plaintiff differently because of her age.

86.    Upon information and belief, Defendants treated Plaintiff differently because of her gender.

87.    Defendants subjected Plaintiff to unwelcome and sexually offensive conduct.

88.    Upon information and belief, Defendants treated Plaintiff differently because of her national origin.

89.    Upon information and belief, Defendants treated Plaintiff differently because of her race, color or ethnicity.

90.    Defendants subjected Plaintiff to unwelcome and culturally offensive conduct.

- 18 -

91.     During Plaintiff's employment with Defendants, Plaintiff was and continued to be regularly exposed to a discriminatory, offensive and hostile work environment.

92.     Plaintiff has been unlawfully harassed, discriminated and retaliated against, was humiliated, and has been degraded and belittled.

93.     Plaintiff's situation at her job was intolerable as a result of the sexual harassment and discrimination by Defendants to which she was subjected, and no reasonable person in Plaintiff's position could be expected to continue working under those conditions.

94.     Although each of the Defendants became aware of the Plaintiff's protests, none of the Defendants took any action to prevent or rectify the discriminatory conduct described above.

95.     Upon information and belief, Defendants terminated Plaintiff's employment while continuing to protect and employ the Individual Defendants who committed sexual harassment, discrimination and created the hostile work environment.

96.     Upon information and belief, in retaliation for reporting the hostile work environment harassment, discrimination and retaliation, the Individual Defendants further escalated the discrimination and harassment which lead to the termination of Plaintiff's employment.

97.     On multiple occasions between 2005 and 2012, Defendant GLEYSTEEN pressured and intimidated Plaintiff into preparing aggressive financial projections associated with new fund raisings that would ultimately be presented to the CIFCC Board.

98.     In 2010 and 2011, upon information and belief, Defendant GLEYSTEEN disregarded Plaintiff's evaluation that the estimated dollar amount and timing of cost synergies associated with the merger of Deerfield Capital Corp. (formerly a NASDAQ listed company)

("Numbers") onto CIFCC's asset management platform ("Transaction") was overly aggressive and unachievable.

99.    Plaintiff recommended that Defendants GLEYSTEEN and BARTLETT should not use the Numbers because there was little due diligence performed and little information to substantiate such amounts.

100.    Upon information and belief, Defendant GLEYSTEEN knew that the Numbers could be misleading for their intended purpose.

101.    Upon information and belief, Defendant GLEYSTEEN knew that the Numbers were not supported by the appropriate due diligence.

102.    Upon information and belief, despite Plaintiff's recommendation and Defendant GLEYSTEEN's knowledge that the Numbers could likely be misleading for their intended purpose and were not supported by appropriate due diligence, Plaintiff was told by Defendant GLEYSTEEN to "just do the work and I will deal with the presentation [of the numbers]."

103.    Upon information and belief, the Numbers were then used to estimate the benefits of the Transaction.

104.    Upon information and belief, despite Plaintiff's warning, Defendant GLEYSTEEN then submitted the Numbers to a special committee ("Special Committee") to approve the Transaction.

105.    The Special Committee had a fiduciary obligation to protect all shareholders, including the minority shareholders, as required under applicable state law.

106. Upon information and belief, Defendants GLEYSTEEN and BARTLETT never informed the Special Committee that the Numbers were most likely misleading or even that they could have been misleading.

107. Defendant GLEYSTEEN repeatedly threatened to remove Plaintiff from her responsibilities if she did not support the Company's financial forecasts and disregarded her position of caution and conservatism.

108. Plaintiff's performance was exceptionally strong during the course of employment with the Defendants, as evidenced by each and every formal employment review that the Plaintiff received during her employment with Defendant CIFCC that indicated the Plaintiff's performance was excellent.

109. Upon information and belief, Defendants have caused damage and injury to Plaintiff by subjecting her to hostile work environment harassment, discrimination and retaliation.

110. Upon information and belief, Defendants have caused damage and injury to the Plaintiff by protecting the Individual Defendants that caused and created the hostile work environment, perpetrated the discrimination, and engaged in retaliation.

111. Upon information and belief, Defendants have caused damage and injury to Plaintiff by retaliating against her and terminating Plaintiff's employment.

112. Upon information and belief, Defendants communicated Plaintiff's termination to everyone at the CIFC Defendants and on Wall Street, irreparably harming Plaintiff's reputation.

113. Upon information and belief, Defendants' actions and conduct were intentional, malicious and reckless, and intended to harm the Plaintiff.

114.    As a result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

115.    Plaintiff's reputation in the industry, once stellar, is now irreparably tarnished.

116.    As a result of Defendants' actions, Plaintiff has suffered significant economic loss.

117.    Plaintiff will continue to suffer significant economic loss as a result of Defendants' conduct as described in this Complaint.

118.    As a result of the Defendants' discriminatory and intolerable treatment, Plaintiff suffered severe emotional distress.

119.    As a result of the Defendants' actions, Plaintiff has suffered physical harm, including, but not limited to, stress-induced medical conditions.

120.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer tremendous and irreparable loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails.

121.    As a result of the acts and conduct complained of herein, Plaintiff has suffered substantial future pecuniary losses, emotional pain, physical pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

122.    As a result of the horrific and degrading acts and conduct complained of herein, Plaintiff has experienced severe emotional and physical distress.

123.    As a result of the acts and conduct complained of herein, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower Courts.

124.    As Defendants' conduct has been willful, reckless, outrageous, intentional and/or malicious, Plaintiff also demands punitive damages in an amount which exceeds the jurisdictional limits of all lower Courts.

125.    Upon information and belief, any reason advanced by Defendants for Plaintiff's termination is pretext for discrimination.

126.    Upon information and belief, Plaintiff's membership in a protected class or protected classes was the reason for this disparate treatment, harassment and discrimination.

127.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

128.    Pursuant to N.Y.C. Admin. Code § 8-502(c), Plaintiff has served the New York City Human Rights Commission and Corporation Counsel of the City of New York with a copy of the instant Complaint.

129.    Plaintiff will also file a charge with the United States Equal Employment Opportunity Commission ("EEOC") under Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000, *et seq.* and the Age Discrimination in Employment Act, as amended, codified at 29 U.S.C. § 621, *et seq.*

130.    Plaintiff will also file a complaint with the Occupational Safety and Health Administration ("OSHA") for unlawful retaliation in violation of the whistle-blower protection provision of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, *et seq.* ("SOX"). Under 18 U.S.C. § 1514A, it is unlawful for an employer to discriminate against an employee for providing information, which the employee reasonably believes constitutes a violation of any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating

to fraud against shareholders, when the information is provided to a person with supervisory authority over the employee.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR RACIAL, ETHNIC AND NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW AND NEW YORK CITY HUMAN RIGHTS LAW

131.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 130 of this Complaint as if fully set forth herein.

132.    Following her hiring and until December 2012, Plaintiff received numerous compliments on her ability and performance as an employee of Defendants.

133.    Following her hiring and until December 2012, Defendants never claimed or intimated, in any way, that Plaintiff did not perform her duties well.

134.    Between November 2005 and March 2012, Plaintiff actively contributed to the growth of Defendant CIFCC, was a member of Defendant CIFCC's senior management, and reported directly to Defendant GLEYSTEEN.

135.    Upon information and belief, Defendants repeatedly subjected to Plaintiff to an ongoing pattern of discriminatory conduct based on her national origin, race, ethnicity, age, sex and gender.

136.    Upon information and belief, other similarly situated employees not of the protected classes received more favorable treatment than Plaintiff.

137.    Upon information and belief, Defendant GLEYSTEEN repeatedly raised Plaintiff's age, gender, race, ethnicity and national origin as reasons why Plaintiff should not have direct marketing role in new funds.

- 24 -

138.    Defendant WRIEDT offered no explanation for Plaintiff's removal from her marketing responsibilities but implied on multiple occasions throughout 2012 that her refusal to participate in late night dinners or drinking sessions were obstacles to her success to market to investors.

139.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York State Executive Law § 296 (New York State Human Rights Law).

140.    The foregoing acts of the Defendants constituted unlawful discrimination in violation of the New York City Administrative Code § 8-502 (New York City Human Rights Law).

141.    The actions of Defendants were wanton and reckless, with malice and without reason or basis, and were arbitrary, capricious and unfounded.

142.    By reason of the foregoing, Plaintiff has suffered loss of income and benefits, and equity holdings and was caused mental and physical anguish, loss of enjoyment of life and emotional distress, all to her damage.

## AS AND FOR A SECOND CAUSE OF ACTION FOR SEX AND GENDER DISCRIMINATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW AND THE NEW YORK CITY HUMAN RIGHTS LAW

143.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 142 of this Complaint as if fully set forth herein.

144.    Upon information and belief, Defendants also repeatedly subjected Plaintiff to a hostile work environment based on her sex and gender.

145.    Defendant GLEYSTEEN indicated that if Plaintiff did not do as he directed in terms of marketing, then Plaintiff would be replaced.

146.    Defendant GLEYSTEEN also commented repeatedly in 2008 through 2012 that the role of lead marketer at Defendant CIFCC would likely be offered to another male executive as Defendant CIFCC pursued various discussions in mergers and acquisitions.

147.    Defendant GLEYSTEEN repeatedly referred to Plaintiff as "a woman" or "an Asian woman" as an explanation why Plaintiff could not possibly succeed in marketing new funds to investors.

148.    Defendant VACCARO also repeatedly referred to Plaintiff as "a Tiger Mom," a derogatory term commonly used to describe a stereotype associated with Asian mothers.

149.    Upon information and belief, Defendant WRIEDT apparently believed that working mothers were incapable of successful marketing, which obviously entailed working after normal business hours and engaging in inappropriate social behavior in order to be part of the "boys' club" on Wall Street.

150.    Upon information and belief, such treatment was not directed against similarly situated male employees.

151.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York State Executive Law § 296 (New York State Human Rights Law).

152.    The foregoing acts of the Defendants constituted unlawful discrimination in violation of the New York City Administrative Code § 8-502 (New York City Human Rights Law).

153.   The actions of Defendants were wanton and reckless, with malice and without reason or basis, and were arbitrary, capricious and unfounded.

154.   By reason of the foregoing, Plaintiff has suffered loss of income and benefits, and equity holdings, and was caused mental and physical anguish, loss of enjoyment of life and emotional distress, all to her damage.

## AS AND FOR A THIRD CAUSE OF ACTION FOR AGE DISCRIMINATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW AND THE NEW YORK CITY HUMAN RIGHTS LAW

155.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 154 of this Complaint as if fully set forth herein.

156.   Plaintiff is over the age of 40 and is therefore in a protected class based upon her age.

157.   Defendants repeatedly subjected Plaintiff to a hostile work environment based on her age.

158.   On numerous occasions in Plaintiff's presence, Defendant GLEYSTEEN would make comments that Plaintiff looked "as if she just graduated from college."

159.   Defendant GLEYSTEEN repeatedly referred to Plaintiff as someone who "looks young" in her presence and among other employees, and capital raising advisers and investors.

160.   On numerous occasions at meetings that were attended by all men with the exception of the Plaintiff, Defendant GLEYSTEEN singled Plaintiff out  and demanded that she go get coffee or order lunch for all the meeting members.

161.    On numerous occasions, Defendant GLEYSTEEN asked Plaintiff to take meeting notes as if she was his assistant, even though Plaintiff suggested other employees of Defendant CIFCC with less experience and responsibility could join him in meetings to take notes.

162.    Upon information and belief, Plaintiff was treated differently because of her age.

163.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York State Executive Law § 296 (New York State Human Rights Law).

164.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York City Administrative Code § 8-502 (New York City Human Rights Law).

165.    The actions of Defendants were wanton and reckless, with malice and without reason or basis, and were arbitrary, capricious and unfounded.

166.    By reason of the foregoing, Plaintiff has suffered loss of income and benefits, and equity holdings, and was caused mental and physical anguish, loss of enjoyment of life, and emotional distress, all to her damage.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR RETALIATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW AND NEW YORK CITY HUMAN RIGHTS LAW

167.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 166 of this Complaint as if fully set forth herein.

168.    Following her notice by Defendant WRIEDT of her removal from the marketing team, Plaintiff reported the harassing and discriminatory conduct to which she had been subjected to Defendant GLEYSTEEN.

169.    During that meeting, Plaintiff was encouraged to find a non-marketing role within CIFCC but Defendant GLEYSTEEN offered no explanation why Plaintiff's roles and responsibilities have changed.

170.    Despite these promises to find a meaningful role for Plaintiff, Defendants VACCARO and GLEYSTEEN did not offer any concrete details on alternatives roles or responsibilities to Plaintiff.

171.    Plaintiff did not believe that Defendants truly desired for her to find any other role within the Company and Plaintiff had no desire to work in a role outside of her area of expertise.

172.    Nonetheless, upon information and belief, there was continued retaliation against Plaintiff whereby Defendants WRIEDT, VACCARO and GLEYSTEEN intentionally left Plaintiff out of key investor meetings and conference calls.

173.    Upon information and belief, in further retaliation, Plaintiff was further excluded from a critical roadshow in Korea, Taiwan, Japan and Singapore, even though Defendant WRIEDT represented that Plaintiff was the best person within Defendant CIFCC to take charge of drafting the entire presentation and which Plaintiff took full responsibility to develop on paper.

174.    In addition to the complaints lodged against Defendant GLEYSTEEN, Plaintiff was excluded from senior management meetings meant to address issues discussed and raised by the Consultant.

175.    These complaints were not responded to prior to Plaintiff's termination, nor to date.

176.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York State Executive Law § 296(1)(e) (New York State Human Rights Law).

177.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York City Administrative Code § 8-502 (New York City Human Rights Law).

178.    The actions of Defendants were wanton and reckless, with malice and without reason or basis, and were arbitrary, capricious and unfounded.

179.    By reason of the foregoing wrongful discharge of Plaintiff by the Defendants, Plaintiff has suffered loss of income and benefits, and equity holdings, and was caused mental and physical anguish, loss of enjoyment of life, and emotional distress, all to her damage.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR DISCRIMINATION AGAINST PLAINTIFF IN WAGES AND COMPENSATION IN VIOLATION OF THE EQUAL PAY ACT OF 1963, NEW YORK STATE HUMAN RIGHTS LAW AND NEW YORK CITY HUMAN RIGHTS LAW

180.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 179 of this complaint as if fully set forth herein.

181.    Notwithstanding Plaintiff's credentials for her position, which include a Bachelor of Science in Economics from Georgetown University and an MBA from the Darden School of Business at the University of Virginia, as well as more than eighteen (18) years of experience, Plaintiff received, upon information and belief, a substantially lower rate of salary, bonus compensation and benefits than those male employees of Defendant CIFCC with equal or lesser credentials than Plaintiff and holding positions of equal or lesser responsibility.

182.    Upon information and belief, Plaintiff was from the outset of her employment and continuing until she was discharged paid a substantially lower rate of salary, bonus compensation

and benefits than those male employees of Defendant CIFCC performing substantially equal work in jobs requiring similar skills, effort and responsibility performed under similar conditions.

183.   Upon information and belief, the difference in Plaintiff's wages, bonus compensation and benefits was as a result of her race, national origin, ethnicity, age, marital status, sex and/or gender.

184.   Defendants further refused to award the 2012 bonus Plaintiff earned.  Defendant WRIEDT indicated that he could hire "cheap labor" to replace Plaintiff and never responded to Plaintiff's inquiries regarding the decision to remove her from her role as Head of Institutional Relations.

185.   Defendants WRIEDT and GLEYSTEEN failed to conduct a performance evaluation of Plaintiff in 2012 in connection with their decisions to remove her from the marketing team or terminate her employment.

186.   Plaintiff was never given a performance review and learned of CIFCC's decision to terminate her and not pay her annual bonus on December 17, 2012.

187.   Upon information and belief, other substantially equal male employees were paid their accrued bonuses.

188.   The foregoing acts of the Defendants constituted unlawful discrimination in violation of the Equal Pay Act of 1963, as amended, codified at 29 U.S.C. § 206, *et. seq.*

189.   The foregoing acts of the Defendants constituted unlawful discrimination in violation of the New York State Executive Law § 296 (New York State Human Rights Law).

190.   The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York City Administrative Code §§ 8-107 and 8-502 (New York City Human Rights Law).

191.   The actions of Defendants were wanton and reckless, with malice and without reason or basis, and were arbitrary, capricious and unfounded.

192.   By reason of the foregoing failure of Defendants to pay Plaintiff a rate of compensation equal to those male employees with similar educational backgrounds and employment skills, Plaintiff has suffered loss of income and benefits, and equity holdings and was caused mental and physical anguish, loss of enjoyment of life and emotional distress, all to her damage.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR SEXUAL HARASSMENT AGAINST ALL DEFENDANTS IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW AND NEW YORK CITY HUMAN RIGHTS LAW

193.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 192 of this Complaint as if fully set forth herein.

194.   Upon information and belief, as a result of the foregoing remarks concerning Plaintiff's sex, Defendants created a sufficiently severe or pervasive hostile environment to alter the conditions of Plaintiff's employment and create an abusive working environment.

195.   These acts culminated in Plaintiff's termination in 2012.

196.   The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York State Executive Law § 296 (New York State Human Rights Law).

197.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York City Administrative Code § 8-502 (New York City Human Rights Law).

198.    The actions of Defendants were wanton and reckless, with malice and without reason or basis, and were arbitrary, capricious and unfounded.

199.    By reason of the foregoing, Plaintiff has suffered loss of income and benefits, and equity holdings, and was caused mental and physical anguish, loss of enjoyment of life, and emotional distress, all to her damage.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR WRONGFUL DISCHARGE ON THE BASIS OF RACE, NATIONAL ORIGIN, AGE, SEX AND GENDER

200.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 199 of this Complaint as if fully set forth herein.

201.    On or about December 17, 2012, Plaintiff was formally informed by Defendants that her services were no longer required.

202.    Upon information and belief, the reasons advanced by Defendants for Plaintiff's termination are pretext for discrimination against Plaintiff on the basis of her race, national origin, ethnicity, age, sex and/or gender.

203.    The foregoing acts of Defendants constituted unlawful discrimination in violation of the New York State Executive Law § 296 (New York State Human Rights Law).

204.    The foregoing acts of the Defendants constituted unlawful discrimination in violation of the New York City Administrative Code § 8-502 (New York City Human Rights Law).

- 33 -

205.     The actions of Defendants were wanton and reckless, with malice and without reason or basis and were arbitrary, capricious and unfounded.

206.     By reason of the foregoing wrongful discharge, Plaintiff has suffered loss of income and benefits, equity holdings, loss of enjoyment of life, and was caused mental and physical anguish, and emotional distress, all to her damage.

207.     The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR FRAUD IN VIOLATION OF NEW YORK STATE LAW

208.     Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 207 of this Complaint as if fully set forth herein.

209.     Upon information and belief, in or about 2005, Defendant GLEYSTEEN and the Defendant CIFCC (through its predecessor, Commercial Industrial Finance Corporation) sold shares to Plaintiff of Commercial Industrial Finance Corporation (a predecessor company to Defendant CIFCC) for $400,000 with the intent to gain the benefit of her proceeds while preventing her from ever realizing the full value for those shares.

210.     Upon information and belief, in or about 2008, Defendant GLEYSTEEN and Defendant CIFCC sold to Plaintiff, Series I Preferred Stock of CIFCC for $100,000 (the "Preferred Stock") with the intent to gain the benefit of her proceeds while preventing her from ever realizing any value for those shares.

211.  At various times throughout Plaintiff's employment with the Company, Defendant GLEYSTEEN and Defendant CIFCC made grants of stock options, restricted stock, preferred stock units, and deferred compensation awards to Plaintiff (the "Equity Awards").

212.  Defendant GLEYSTEEN and Defendant CIFCC promised the Plaintiff that the Equity Awards would have value equivalent to the portion of the affiliated group of CIFCC that those awards purported to represent.

213.  Defendant GLEYSTEEN and Defendant CIFCC  promised the Plaintiff that the Equity Awards would have value that exceeded 2.5% of the value of CIFCC's affiliated group with full anti-dilution rights.

214.  None of the Defendants provided Plaintiff with accurate and adequate disclosure regarding the value and terms and conditions of the Equity Awards at the time of grant or at any time thereafter through the date hereof.

215.  At various times during the period from 2005 through the present, Defendants provided significant information to other investors relating to the value of Defendant CIFCC's affiliated group that was not provided to Plaintiff.

216.  Defendants have valued the Equity Awards and the Preferred Stock at substantially less than the value equivalent to the portion of the affiliated group of Defendant CIFCC that the Equity Awards and the Preferred Stock purport to represent.

217.  The Defendants have valued the Equity Awards at substantially less than 2.5% of the value of CIFCC's affiliated group.

218.  As a result of these material misrepresentations inducing Plaintiff to purchase the Preferred Stock and the Equity Awards, Plaintiff seeks the greater of (i) the full value of the

services that Plaintiff provided to Defendants from 2005 through the present less the value of any

cash paid to her by Defendants for her services; and (ii) the full value of the Equity Awards and

the Preferred Stock as measured in accordance with the terms and conditions described to

Plaintiff in advance of the grant of the such equity (including, without limitation, an undiluted

2.5% of the fair market value of CIFCC's affiliated group, which represents the minimum

promised value of a portion of the Equity Awards), plus treble damages resulting from the

fraudulent nature of the aforementioned conduct, plus such additional punitive damages as the

Court may find necessary and appropriate to punish Defendants for their conduct and prevent

Defendants from engaging in such conduct in the future with regard to Plaintiff or any other

employee or share or interest holder.

## AS AND FOR A NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY IN VIOLATION OF NEW YORK STATE LAW

219.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1

through 218 of this Complaint as if fully set forth herein.

220.    Upon information and belief, Defendants issued compensatory securities to

Plaintiff in order to entice Plaintiff to continue to provide services to the Company but the

Defendants had no expectation of providing Plaintiff with adequate value for those securities and

deliberately provided inadequate intentionally misleading information in order to mislead

Plaintiff as to the value of the securities and other compensation that she was receiving.

221.    Upon information and belief, Defendant GLEYSTEEN, acting in his individual

capacity and as an officer of the Company, breached his fiduciary duty to Plaintiff as shareholder

and creditor of the Company by soliciting the purchase of the Preferred Stock and the Equity

Awards by intentionally providing inadequate or misleading information in connection with those securities.

222.    Upon information and belief, Defendants EISENSON, PALMER and BARTLETT, aided and abetted or conspired with Defendant GLEYSTEEN in his conduct described in the preceding paragraph.

223.    As a result of the conduct described in this Ninth cause of action, Plaintiff seeks the greater of (i) the full value of the services that Plaintiff provided to Defendants from 2005 through the present less the value of any cash paid to her by Defendants for her services; and (ii) the full value of the Equity Awards and the Preferred Stock as measured in accordance with the terms and conditions described to Plaintiff in advance of the grant of the such equity (including, without limitation, an undiluted 2.5% of the fair market value of CIFCC's affiliated group, which represents the minimum promised value of a portion of the Equity Awards), plus treble damages resulting from the fraudulent nature of the aforementioned conduct, plus such additional punitive damages as the Court may find necessary and appropriate to punish the Defendants for their conduct and prevent the Defendants from engaging in such conduct in the future with regard to the Plaintiff or any other employee or share or interest holder.

224.    As a result of the conduct described in this Ninth cause of action, the amount of damages sought in this action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## AS AND FOR A TENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR FRAUD UNDER DELAWARE STATE LAW

225.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 224 of this Complaint as if fully set forth herein.

226.   Upon information and belief, at the time of the negotiation and issuance of the Preferred Stock and the Equity Awards, Defendants provided Plaintiff with inadequate or misleading information regarding the character and value of the equity in the Company and its affiliates that was purported to be granted to her in a deliberate attempt to deceive the Plaintiff into providing services to them.

227.   Prior to the date on which the Defendants terminated Plaintiff's employment with CIFCC, Plaintiff did not discover - and could not have discovered - the value that Defendants ascribed the Preferred Stock or the Equity Awards.

228.   Plaintiff was induced to purchase the Preferred Stock and Equity Awards through a combination of cash, deferred compensation and services in reliance upon the representations made by, and on behalf of, Defendants.

229.   Plaintiff's reliance described in the preceding paragraph was justifiable.

230.   As a result of these material misrepresentations and/or inadequate disclosure inducing Plaintiff to purchase the Preferred Stock and the Equity Awards, Plaintiff seeks the greater of (i) the full value of the services that Plaintiff provided to Defendants from 2005 through the present less the value of any cash paid to her by Defendants for her services; and (ii) the full value of the Equity Awards and the Preferred Stock as measured in accordance with the terms and conditions described to Plaintiff in advance of the grant of the such equity (including, without limitation, an undiluted 2.5% of the fair market value of CIFCC's affiliated group, which represents the minimum promised value of a portion of the Equity Awards), plus treble damages resulting from the fraudulent nature of the aforementioned conduct, plus such additional punitive damages as the Court may find necessary and appropriate to punish the Defendants for their

conduct and prevent the Defendants from engaging in such conduct in the future with regard to

the Plaintiff or any other employee or share or interest holder.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY UNDER DELAWARE STATE LAW

231.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1

through 230 of this Complaint as if fully set forth herein.

232.    Upon information and belief, Defendant GLEYSTEEN, as an officer of

Defendant CIFCC, who signed the Equity Awards on its behalf, was aware that Defendant

CIFCC was not providing Plaintiff with periodic updates on the valuation of the Equity Awards,

and had no expectation of providing sufficient information to Plaintiff on which to base a

reasonable estimation of the value of the Equity Awards.

233.    As a result of these material misrepresentations inducing Plaintiff to purchase the

Equity Awards, Plaintiff seeks the greater of (i) the full value of the services that Plaintiff

provided to Defendants from 2005 through the present less the value of any cash paid to her by

Defendants for her services; and (ii) the full value of the Equity Awards and the Preferred Stock

as measured in accordance with the terms and conditions described to Plaintiff in advance of the

grant of the such equity (including, without limitation, an undiluted 2.5% of the fair market value

of CIFCC's affiliated group, which represents the minimum promised value of a portion of the

Equity Awards), plus treble damages resulting from the fraudulent nature of the aforementioned

conduct, plus such additional punitive damages as the Court may find necessary and appropriate

to punish Defendants for their conduct and prevent Defendants from engaging in such conduct in

the future with regard to the Plaintiff or any other employee or share or interest holder.

## AS AND FOR A TWELFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATION OF § 73-210(b) AND § 73-605 OF THE DELAWARE SECURITIES ACT (6 DEL. C. § 73-101 et seq.)

234.   Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 233 of this Complaint as if fully set forth herein.

235.   Defendant CIFCC was directly or indirectly controlled by Defendants.

236.   The issuance of the Preferred Stock and the Equity Awards constituted a sale of securities.

237.   Upon information and belief, the individual Defendants controlled the actions of Defendant CIFCC, the issuer of the Preferred Stock and the Equity Awards, and constitute "liable" persons within the meaning of § 73-605(b) of the Delaware Securities Act.

238.   Upon information and belief, Defendants made untrue statements of material fact and/or omitted material facts that were necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in connection with the sale of the Preferred Stock and the Equity Awards.

239.   Defendants represented that Plaintiff would be provided reasonable and periodic updates on the value of the Preferred Stock and the Equity as well as Plaintiff's exact holdings and investment market value.

240.   Upon information and belief, Defendants knew or should have known that the representation in the preceding paragraph was false.

241.   Defendants failed to inform Plaintiff as to the value of the Equity Awards or the Preferred Stock.

242.    As a result of these material misrepresentations inducing Plaintiff to purchase the Preferred Stock and the Equity Awards, Plaintiff seeks the greater of (i) the full value of the services that Plaintiff provided to Defendants from 2005 through the present less the value of any cash paid to her by Defendants for her services; and (ii) the full value of the Equity Awards and the Preferred Stock as measured in accordance with the terms and conditions described to Plaintiff in advance of the grant of the such equity (including, without limitation, an undiluted 2.5% of the fair market value of CIFCC's affiliated group, which represents the minimum promised value of a portion of the Equity Awards), plus treble damages resulting from the fraudulent nature of the aforementioned conduct, plus such additional punitive damages as the Court may find necessary and appropriate to punish the Defendants for their conduct and prevent the Defendants from engaging in such conduct in the future with regard to the Plaintiff or any other employee or share or interest holder.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATING RULE 10b-5 OF THE SECURITIES EXCHANGE ACT OF 1934

243.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 242 of this Complaint as if fully set forth herein.

244.    Upon information and belief, Defendants made false and misleading statements in connection with the purchase of the Preferred Stock and the Equity Awards.

245.    As a result of these material misrepresentations inducing Plaintiff to purchase the Preferred Stock and the Equity Awards, Plaintiff seeks the greater of (i) the full value of the services that Plaintiff provided to Defendants from 2005 through the present less the value of any cash paid to her by Defendants for her services; and (ii) the full value of the Equity Awards and the Preferred Stock as measured in accordance with the terms and conditions described to

Plaintiff in advance of the grant of the such equity (including, without limitation, an undiluted 2.5% of the fair market value of CIFCC's affiliated group, which represents the minimum promised value of a portion of the Equity Awards), plus treble damages resulting from the fraudulent nature of the aforementioned conduct, plus such additional punitive damages as the Court may find necessary and appropriate to punish Defendants for their conduct and prevent Defendants from engaging in such conduct in the future with regard to Plaintiff or any other employee or share or interest holder.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR VIOLATING THE DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT

246.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 245 of this Complaint as if fully set forth herein.

247.    Defendant CIFCC is a publicly traded company governed by the Dodd-Frank Wall Street Reform and Consumer Protection Act, codified at 78 U.S.C. § 78u-6, *et seq.* ("Dodd-Frank Act").

248.    Section 922(h) of the Dodd-Frank Act creates a private cause of action for whistleblowers who have made disclosures that are required or protected by the Sarbanes-Oxley Act, the Securities Exchange Act of 1934 and any other law or regulation subject to the jurisdiction of the SEC. 78 U.S.C. § 78u-6(h)(1)(A). Under this provision, everything that was protected under the Sarbanes-Oxley Act and the Securities Exchange Act of 1934 is also protected under § 922 of the Dodd-Frank Act.

249.    Plaintiff engaged in protected activity under the Dodd-Frank Act by disclosing to Defendants GLEYSTEEN and BARTLETT that they should not use the Numbers because they

could likely be misleading for their intended purpose and there was little due diligence performed and little information to substantiate such amounts.

250.   Upon information and belief, Defendant GLEYSTEEN knew that the Numbers could be misleading for their intended purpose.

251.   Upon information and belief, Defendant GLEYSTEEN knew that the Numbers were not supported by the appropriate due diligence.

252.   Defendants violated the Dodd-Frank Act by discharging Plaintiff and taking other adverse employment action with respect to the Plaintiff, at least in part and in addition to discharging her on the basis of her race, ethnicity, national origin, sex, gender and age, because she made this and other similar disclosures to Defendants GLEYSTEEN and BARTLETT (as well as representatives of the Company and the Board) during the term of her employment.

253.   Section 922(h) of Dodd-Frank permits individuals like Plaintiff to file suit directly without first filing with the United States Department of Labor. 78 U.S.C. § 78u-6(h)(l)(B)(i).

254.   As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered loss of income and benefits, equity holdings, damage to reputation, humiliation, loss of enjoyment of life, and was caused mental and physical anguish, and emotional distress, all to her damage.

255.   As a proximate result of Defendant's wrongful conduct, Plaintiff is also entitled to receive double the amount of back pay plus interest.

256.   The actions of Defendants were wanton and reckless, with malice and without reason or basis and were arbitrary, capricious and unfounded. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages.

257.    The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff NGA TRAN-PEDRETTI demands judgment against Defendants CIFC ASSET MANAGEMENT LLC, CIFC CORP., CIFC ACQUISITION CORP., CIFC PARENT HOLDINGS LLC, PETER GLEYSTEEN, STEVE VACCARO, OLIVER WRIEDT, FREDERICK ARNOLD, SAMUEL P. BARTLETT, MICHAEL EISENSON, JASON EPSTEIN, ANDREW INTRATER, PAUL F. LIPARI, ROBERT B. MACHINIST, TIM R. PALMER and FRANK C. PULEO as follows:

(a)     On its First Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(b)     On its Second Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(c)     On its Third Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, liquidated damages, damages for emotional distress, pre- and post-judgment interest, and any other

relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(d)     On its Fourth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(e)     On its Fifth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, liquidated damages, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(f)     On its Sixth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(g)     On its Seventh Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, liquidated damages, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess

of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(h)     On its Eighth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(i)     On its Ninth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(j)     On its Tenth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(k)     On its Eleventh Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(l)     On its Twelfth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(m)     On its Thirteenth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(n)     On its Fourteenth Cause of Action against all Defendants, an amount to be determined at trial, including compensatory damages, including front pay and back-pay, damages for emotional distress, pre- and post-judgment interest, and any other relief available under applicable statutes, but currently estimated to be in excess of Sixteen Million, Nine Hundred Thousand Dollars ($16,900,000.00), plus statutory interest;

(o)     Punitive damages on all causes of action in the amount of Thirty-Seven Million Dollars ($37,000,000.00);

(p)     On each of the above causes of action costs, disbursements, attorneys' fees, other legal fees, and relief for any negative tax implications Plaintiff may incur from the receipt of damages under any cause of action; and

(q)     Such other and further relief as this court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Dated: New York, New York
      June 5, 2013

                                 **Reed Smith LLP**

                                 By:

                                 Casey D. Laffey
                                 599 Lexington Avenue, 26th Floor
                                 New York, New York 10022
                                 Tel. (212) 521-5400
                                 Fax. (212) 521-5450
                                 Email: claffey@reedsmith.com
                                 *Attorneys for Plaintiff*
                                 *Nga Tran-Pedretti*