

Patrick Boyd| Partner
370 Lexington Avenue, Suite 1705
New York, NY 10017
Tel 212-867-3675
Fax 212-867-5765
pboyd@theboydlawgroup.com

December 6, 2013

VIA EMAIL (sullivannysdchambers@nysd.uscourts.gov) & ECF
Hon. Richard J. Sullivan
United States District Court
Southern District of New York
500 Pearl Street, Room 640
New York, NY 10007

Re:   Nga Tran-Pedretti v. CIFC Asset Management LLC et al; 13-CV-04420 (RJS) (KNF)

Dear Judge Sullivan:

The parties hereby jointly submit this letter in accordance with Your Honor's Individual Practices to request the Court's intervention to resolve certain discovery disputes.

1. **Consultant's Notes**   The first dispute concerns Plaintiff's request for production of complete and unredacted notes prepared by an organizational consultant retained by the Defendants months prior to Plaintiff's termination of employment. The notes at issue ("Consultant's Notes") are ninety-two (92) pages of typed and handwritten notes prepared by Tom Beaton of Next Step LLC ("the Consultant"). Defendants produced the Consultant's Notes with numerous portions redacted, subject to the Confidentiality Order in place, and invited Plaintiff's counsel to review the unredacted versions together with Defendants' counsel to confer and discuss the reasons for the redactions transparently and in good faith.  Counsel met on November 4, 2013 to review unredacted copies of the notes hoping to reach common ground vis-à-vis disclosing additional portions of the documents. After review of the unredacted portions, Plaintiff's counsel reiterated their request for production of the complete unredacted Consultant's Notes.  Defendants' counsel maintained their objections. In connection with this dispute, Defendants will submit by hand delivery the redacted and unredacted versions of the notes to the Court for *in camera* review on Monday.

*Plaintiff's Position.*  In July 2012, CIFC's Board hired the Consultant to, among other things, investigate CIFC's hostile work environment, organizational structure, decision-making process, and the conduct of its senior leadership team along with their impact on CIFC's ability to meet its business objectives. The Consultant interviewed numerous executives and CIFC Board members, including Plaintiff and Individual Defendants Gleysteen, Vaccaro, Wriedt, Epstein, Intrater, Lipari, Bartlett, Palmer, and Eisenson.  The Consultant's Notes are meaningfully critical of CIFC's work environment – described as hostile – and its senior leadership, primarily Defendant Gleysteen.  A cursory review of the initial pages of the Consultant's Notes confirms the foregoing.

The unredacted Consultant's Notes are highly probative of all of Plaintiff's claims and substantiate Plaintiff's concerns regarding the toxic work environment at CIFC, discrimination, retaliation, and securities law violations.   After the Consultant's Notes were presented by the Consultant to the CIFC Board, and as reflected in the CIFC Board talking points, the CIFC Board implemented fundamental management changes, including stripping Defendant Gleysteen of numerous CEO duties and responsibilities (such as the power to hire or fire employees and to set executive

1

compensation) and empowering a "Management Committee" (essentially an office of the CEO) to run CIFC as a new "partnership model". The other members of the CIFC Management Committee would report directly to the CIFC Board, not to the CEO. Effectively, the CIFC Board demoted Defendant Gleysteen but left him employed by CIFC with the title CEO because they apparently viewed this as the least disruptive option available. The CIFC Board also took on a much more active role in running CIFC's business.

To our understanding, Defendants never disclosed the Consultant's Notes to any CIFC employee. Defendant Gleysteen's demotion, moreover, was disclosed to only a limited number of CIFC senior employees who were each warned that they would be "fired on the spot" if they discussed these changes publicly. *More importantly, CIFC has not disclosed these changes to investors in the marketplace in what appears to be a direct violation of the securities laws.* [1] The SEC considers a CEO demotion, such as Gleysteen's, as equivalent to a "termination" which requires a Form 8k filing.[2] Plaintiff only recently learned of this securities law violation through discovery (as she never had reason to examine CIFC's 8-K's until this action was commenced), so the fact that Plaintiff did not allege this in the Complaint is of no moment. In addition, co-Principal Executive Officers are required to file §§ 302 and 906 financial statement certifications under Sarbanes-Oxley.[3] No other member of the Management Committee filed §§ 302 and 906 certifications. The conduct described above directly relates to Defendant's pattern of misleading shareholders – which is the basis for Plaintiff's existing Sarbanes-Oxley and § 10b-5 claims – and may subject Defendants to additional § 10b-5 claims by Plaintiff and, potentially, other private and public investors, as well as to penalties from the SEC and DOJ. The unredacted Consultant's Notes are, thus, the key to understanding CIFC's scheme since it was the Consultant's disclosures to CIFC's Board regarding the hostile work environment, severe abuse of employees, and mismanagement that precipitated the management shakeup.

Following these management changes, Defendant Gleysteen confronted Plaintiff in her office about what she told the Consultant (since Defendant Gleysteen was not privy to the Consultant's Notes). Defendant Gleysteen threatened Plaintiff that "more than one person would pay" for what was said to the Consultant. Plaintiff was candid with Defendant Gleysteen about what she divulged to the Consultant; months later, her employment was involuntarily terminated by CIFC's Board.

Given the broad scope of discovery under Fed. R. Civ. P. 26(b), Plaintiff submits that the redacted portions of the Consultant's Notes are indeed highly relevant to and probative of Plaintiff's claims and must be produced in their complete form. After reviewing the redacted and unredacted notes side-by-side on November 4, 2013, Plaintiff's counsel was unable to discern any logical basis for the redactions, some of which occurred in mid-sentence. Even many of the listed Key Issues identified on pages 1 and 2 of the Consultant's Notes being investigated were redacted, and we surmise the redactions are apparently based solely on defense counsel's concerns regarding potential embarrassment of its executives. As to Defendants' concerns that the redacted contents of the Consultant's Notes are "embarrassing," which Plaintiff does not concede, the remedy for the objecting party is a protective order – which already exists in this case. See *In Re Agent Orange Prod. Liab. Litig.*, 821 F.2d 139, 145-46 (2d. Cir. 1987). As such, Defendants have no basis for redacting the Consultant's Notes.

---

[1] Indeed, to this day, in its SEC filings, CIFC holds Defendant Gleysteen out to the public as its titular CEO. CIFC publicly acknowledged the very existence of CIFC's Management Committee's Committee and its role in running CIFC the business *for the first time* in a December 3, 2013 press release regarding Columbus Nova's (an affiliate of Defendants Epstein, Intrater and Lipari) acquisition of a controlling interest in CIFC from Charlesbank (an affiliate of Defendants Bartlett, Palmer and Eisenson) in a private sale for $9.00 a share, a 13% premium..

[2] SEC Interpretative Guidance for Form 8k. Question 117.03 (www.sec.gov/divisions/corpfin/guidance/8-kinterp.htm)

[3] See Exchange Act Rules Compliance & Disclosure Interpretations. Question 161.07 www.sec.gov/divisions/corpfin/guidance/exchangeactrules-interps.htm.)

This is simply not a basis upon which to withhold relevant evidence.  The fact that CIFC chose to conceal the Consultant's findings from its personnel and investors in the marketplace should not preclude production of this relevant evidence to Plaintiff.  The detailed abuse of employees, hostile work environment, discrimination, retaliation, mismanagement, and potential securities fraud to which the redacted Consultant's Notes speak may very well be appalling to CIFC's employees and investors in the marketplace, given their inherently unlawful nature.  However, Defendants are sophisticated businessmen and executives, and in Federal Court litigation, they have no legal entitlement to protection from such disclosure or embarrassment.[4]

*Defendants' Position.*  In July 2012, Defendants retained the Consultant to analyze and advise on CIFC's organizational structure and management following the Company's transition from a smaller private company to a larger, public one after its merger with another company.  Consultant interviewed numerous company executives (including, among others, Plaintiff and Defendants Gleysteen, Vaccaro and Wriedt), taking notes as he did so, and reported his findings to CIFC's Board of Directors. During these interviews, the executives were encouraged to be completely open in expressing their opinions about the company and each other and were assured that the notes would be held confidential, except to the extent that the interviewees gave the Consultant permission to share their thoughts with the Board. Thereafter, the Consultant participated as a facilitator in several meetings with CIFC management that included, but were not limited to, discussions regarding reorganization of the workforce. None of the executives who were interviewed, nor any other company employee, have received copies of or been permitted to read the Consultant's notes, nor were they present at the Board meeting in which the results of the interviews were discussed.  Nevertheless, Plaintiff demands unfettered access to all of the Consultant's notes in connection with his work on behalf of CIFC, regardless whether those notes pertain to Plaintiff, Defendant Gleysteen as a manager of employees, the work atmosphere at CIFC or the reorganization that resulted in the reduction-in-force in which Plaintiff was one of the affected employees – all such portions of the notes have been fully disclosed in unredacted form.  Defendants have reasonably redacted only those portions that do not pertain to any of the foregoing topics, but instead, involve broader and more sensitive opinions regarding business strategy, personal competencies and corporate governance.

The redacted sections of the Consultant's files go well beyond the scope of this litigation, are not likely to lead to the discovery of admissible evidence, are not being requested for any legitimate purpose, but rather, to annoy and embarrass the individual Defendants, and are therefore properly the subject of a protective order pursuant to Rule 26(c).  Courts in this Circuit routinely deny discovery requests which have no conceivable bearing on the issues to be litigated and which fail to advance a plaintiff's theory of the case. *See, e.g., Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602, 608 (S.D.N.Y. 1989); *Blum v. Schlegel*, 150 F.R.D. 38, 40 (W.D.N.Y. 1993).  The redacted sections of the files fall squarely into this category.  Plaintiff's only conceivable purpose in insisting upon production of the unredacted files is to harass and cause substantial embarrassment to certain Defendants who openly expressed their opinions of each other to the Consultant, and who must continue to work together as a team to lead the business.

Defendants disagree with and object to the way Plaintiff has described the contents of the notes (as just one example, there is not one word in the notes about discrimination or hostile work environment *based on gender, race, national origin or any other protected characteristic* alleged in Plaintiff's Complaint).  It is telling that Plaintiff claims to be seeking the unredacted notes in connection with a claim that is not in the Complaint, alleging that the company was obligated to file a Form 8-k when the company's Management Committee was created last year (the facts of which she has also

---

[4] As a practical matter we note that it is difficult, if not unethical, as counsel for Plaintiff to be precluded from sharing relevant information with our clients in the course of appropriate representation.

completely distorted based on a fundamental misunderstanding of what the Management Committee is), when, in fact, it did not have any such obligation. CIFC holds Gleysteen out to the public as its CEO because he *is* its CEO. Moreover, the redacted notes have no probative value to such claim because they were taken *before* the Management Committee was created and do not address Gleysteen's duties and responsibilities after its creation, which is the key question in determining whether a Form 8-k filing was required. In any event, Plaintiff may lack standing to bring such a claim, and she has suffered absolutely no damages related to such claim, because as a company employee she was informed about the creation of the Management Committee at the time it occurred. Whether a Form 8-k should have been filed is irrelevant to her situation and her Complaint.

In sum, Plaintiff does not need the redacted portions to support her claims in any way whatsoever, but is simply seeking to air the company's "dirty laundry" as a leverage point as she continues to insist upon being bought out of her Company equity holdings at an unreasonable premium. Defendants note that prior to departing the Company and filing an action against the Company, Plaintiff expressed to people that she intended to employ such a strategy if she was not compensated to her satisfaction in connection with her termination. Such purpose is not within the federal rules and is plainly improper.[5] Defendants therefore seek permission to move for such protective order with respect to the redacted portions of the Consultant's files to protect them "from annoyance, embarrassment [and] oppression." Fed. R. Civ. P. 26(c)(1).

2. **Email Search**  Counsel are presently negotiating issues related to e-mail searches. They are optimistic they will resolve this; however, there is one issue on which the parties fundamentally disagree is whether e-mails from Plaintiff's spouse should be searched for responsive documents.

*Defendants' Position.* Plaintiff's husband is an attorney at Reed Smith LLP. Plaintiff made her husband's business email account relevant by sending *work-related* emails, during the years that she was employed at CIFC, to his work account from her CIFC account, and receiving responses from his account, for the purpose of engaging in discussions about things happening within CIFC that she has now placed at issue in this lawsuit. This was, of course, completely inappropriate; nevertheless, it is clear that Plaintiff's husband's email account is now a known source of potentially responsive and relevant emails, and it should be searched for the same search terms Plaintiff seeks to have searched in Defendants' email accounts. Defendants proposed and search end-date of January 1, 2013, thus the request would not cover the time period during which Reed Smith has been counsel to Plaintiff in this action. Plaintiff cannot have it both ways, making the choice to send work-related emails to her husband's account, and then using the fact that she has retained his law firm as co-counsel to shield his email account from discovery.

*Plaintiff's position.* As Defendants note, Reed Smith, LLP is co-counsel in this action. As such, the communications between Plaintiff and Reed Smith, including Mr. Pedretti, are privileged. Defendants first raised the issue of reviewing Mr. Pedretti's business email account two (2) weeks ago. Notwithstanding the privileged nature of these communications (and we note that spousal privilege may be applicable, as well), Defendants' argument here is fundamentally flawed: that because Plaintiff sent e-mails to Mr. Pedretti, his e-mails are now discoverable as a matter of course. If this was correct, discovery in every case would devolve into a battle over production from legions of unrelated third party e-mail recipients. Defendants acknowledge they have Plaintiff's sent email to Mr. Pedretti, what response, if any, he gave, is thus irrelevant – he is not a party to this action. Finally, Reed Smith (the entity with control over such e-mails) is not a party to this action and is not subject to disclosure under

---

[5] See United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995) ("unlimited access to every item turned up in the course of litigation would be unthinkable. Reputations would be impaired, personal relationships ruined, and businesses destroyed on the basis of misleading or downright false information.").

Rule 34 which only applies to parties. F.R.C.P. 34(a) ("A party may serve on any other party a request within the scope of Rule 26(b)").

3. **Depositions**

*Defendants' position.*  Plaintiff has refused to sit for her deposition, which was first noticed on July 2, from virtually the beginning of this case. Defendants were sued six months ago, dragged through the media, lost business, sat through a failed mediation, and yet, have been deprived of an opportunity to ask Plaintiff directly a single question about any of her claims. Defendants had offered four proposed dates for her deposition before the original discovery deadline - October 15, 22, 23, and November 15 – and Plaintiff rejected each date, on the ground that *all* documents had not yet been produced, even though (i) Plaintiff's failure to deliver in a timely fashion specific proposed email search terms is the primary reason that all documents had not been produced and (ii) Plaintiff's own document production has been woefully inadequate. Simultaneously, Plaintiff insisted that Defendants should commit to dates for the seven depositions she noticed.  Yet, when Defendants offered to produce every one of the noticed deponents between November 16 and November 29, if she would commit to being deposed on November 15, she refused.  It was entirely inappropriate for Plaintiff to try to engineer deposition priority in this manner; this is, in fact, the reason that Plaintiff's last minute request for a 90-day discovery extension – which Defendants did not join – was made.  After the discovery deadline was extended, Defendants offered December 19 or 20 for Plaintiff's deposition, the earliest Defendants' counsel could do so because of a trial that was scheduled well before Plaintiff sought a discovery extension in this case. This morning, she accepted December 20. Defendants are in the process of obtaining and arranging the schedules of their deponents so that they can propose dates thereafter; long-standing holiday vacation plans for these individuals is making scheduling extraordinarily difficult. Further, one of the deponents is the non-party Consultant mentioned above whose office is in Boston, thus requiring travel for his deposition.  Plaintiff's suggestion below that the Court should direct these individuals to be deposed before she is deposed is completely inappropriate, prejudicial and unfair.  The Court should not permit Plaintiff to succeed in the gamesmanship by which she has tried to gain deposition priority. Rather, Plaintiff should be ordered to reduce the number of depositions she is permitted to take to four individuals who actually worked for CIFC and are the individuals she accuses of wrongdoing in her Complaint: Gleysteen, Wriedt, Vaccaro and Milton.  Her requests to take the depositions of the Chairman of Board, Mike Eisenson; Board member Jason Epstein, and the non-party Consultant, are excessive, cumulative and unnecessary.  There should be consequences to Plaintiff for the haphazard manner in which she has approached this litigation.[6]

*Plaintiff's position.*  Plaintiff agreed to be deposed on December 20, as proposed by Defendants. Given the close of discovery on January 6, Plaintiff has correspondingly proposed that Defendants be available for deposition in advance of December 20, particularly since the scheduling order specifically states there is no priority in depositions.  We have not requested that all Defendants appear in this time frame, but depositions cannot be stalled entirely before December 20, as Defendant's suggest.  Nor does Plaintiff consent to the unreasonable limitations Defendants demand as to the number and identity of individuals who may be deposed.  Plaintiff simply requests the Court direct that at least some Defendants be produced for deposition prior to December 20 to enable the parties to meet the discovery deadline. We disagree with Defendant's diatribe on this issue but choose not to tender further detail herein.

Respectfully submitted,<br>Patrick J. Boyd, Esq.

cc:     John F. Fullerton III, Esq.

---

[6] Because the parties are in agreement that the private JAMS mediation has concluded, Defendants also renew their request that the Court direct the Magistrate Judge to schedule the settlement conference called for in the July 26, 2013 Scheduling Order.